```
1                    UNITED STATES DISTRICT COURT
                        DISTRICT OF MINNESOTA
2
    -----------------------------------------------------------
3                                   )
    United States of America,       )   File No. 18-CR-26
4                                   )            (PJS/ECW)
            Plaintiff,              )
5                                   )
    vs.                             )   St. Paul, Minnesota
6                                   )   December 17, 2019
    Tnuza Jamal Hassan,             )   10:07 a.m.
7                                   )
            Defendant.              )
8   -----------------------------------------------------------

9
             BEFORE THE HONORABLE ELIZABETH COWAN WRIGHT
10           UNITED STATES DISTRICT COURT MAGISTRATE JUDGE
                          (COMPETENCY HEARING)
11
    APPEARANCES
12    For the Plaintiff:          United States Attorney's Office
                                  Charles Kovats, Jr., AUSA
13                                300 South 4th Street
                                  Suite 600
14                                Minneapolis, Minnesota 55415

15    For the Defendant:          Sicoli Law, Ltd.
                                  Robert Sicoli, ESQ.
16                                333 South Seventh Street
                                  Suite 2350
17                                Minneapolis, MN 55402

18    Court Reporter:             Lynne M. Krenz, RMR, CRR, CRC
                                  Suite 146
19                                316 North Robert Street
                                  St. Paul, Minnesota 55101
20

21
          Proceedings recorded by mechanical stenography;
22    transcript produced by computer.

23

24

25


                        LYNNE M. KRENZ
                         (651)848-1226
```

1                           I N D E X

2

3       **GOVERNMENT'S WITNESSES:**                           **PAGE**
        DR. AMOR CORREA
4           Direct Examination  By Mr. Kovats.................   9
            Cross-Examination By Mr. Sicoli...................  30
5

6       **GOVERNMENT'S EXHIBITS:**                         **RECEIVED**
        Exhibit 1..........................................   9
7       Exhibit 2..........................................   9

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

1                          **P R O C E E D I N G S**

2                              **IN OPEN COURT**

3          (Defendant present)

4                  THE COURT:  We're here today -- is this on?  Can

5     you hear me?  Okay.  Thank you.

6                  All right.  I'm Magistrate Judge Wright and we're

7     here today for a hearing pursuant to 18 U.S.C. 4241(e) to

8     determine competency in the Matter of United States versus

9     Hassan, Case Number 18-CR-26 PJS/ECW.

10                 Could Counsel make their appearances for the

11    record, beginning with Counsel for the Government.

12                 MR. KOVATS:  Good morning, Your Honor.  Charles

13    Kovats for the United States.

14                 THE COURT:  Good morning.

15                 MR. SICOLI:  Good morning, Your Honor.

16                 Robert Sicoli and Joshua Johnson on behalf of Ms.

17    Hassan.

18                 THE COURT:  Okay.  Good morning to both of you.

19                 And I understand we have Ms. Hassan via video

20    conference?

21                 THE DEFENDANT:  Yes.

22                 THE COURT:  All right.  And are you able to hear

23    the proceedings, Ma'am?

24                 THE DEFENDANT:  Yes, I can.

25                 THE COURT:  Okay.  Thank you.

1              And just as a logistical matter, since we're doing

2     this via video conference, we have an option as to which

3     camera is being used.

4              Mr. Sicoli, for your client so she can either get

5     an overall view of the courtroom from the back of the room

6     or we can try to focus in on the attorneys when they're

7     making their argument.

8              On behalf of Ms. Hassan do you have any preference

9     or do you want me to explore that with her?

10             I want to make sure she can participate as fully

11    as possible.

12             MR. SICOLI:  Yeah.  I haven't had a chance to

13    discuss it with her.  I don't think it would make a

14    difference --

15             THE COURT:  Okay.

16             MR. SICOLI:  On her viewpoint, though.

17             THE COURT:  All right.  Ms. Hassan, are you

18    looking at the overall courtroom right now?  Can you see all

19    of it?

20             THE DEFENDANT:  Yeah, I can see.

21             THE COURT:  And is that working for you?  Is that

22    okay?

23             THE DEFENDANT:  Yes.  It's good.

24             THE COURT:  Okay.  All right.  Well then we'll

25    just stick with that view and if it becomes an issue just

1    let us know, okay?

2              THE DEFENDANT:  Okay.

3              THE COURT:  All right.  So as I've said, we're

4    here under 4241(e) regarding competency.

5              How would the -- how would the parties propose to

6    proceed today?

7              Mr. Kovats?

8              MR. KOVATS:  Your Honor, if it makes sense to the

9    Court and Counsel for the Defendant, I'd propose by first

10   maybe administratively just getting a waiver of Ms. Hassan's

11   appearance in person for today just to get that on the

12   record.

13             And then I would at that point offer to do a

14   direct examination of Dr. Correa and walk her through her

15   report and her conclusions and then offer for

16   cross-examination to Mr. Sicoli or Mr. Johnson.

17             THE COURT:  All right.  Thank you, Mr. Kovats.

18             Mr. Sicoli, does that sound agreeable to you?

19             MR. SICOLI:  It is, Your Honor.

20             THE COURT:  And will you be calling any witnesses

21   on behalf of Ms. Hassan?

22             MR. SICOLI:  We will not, Your Honor.

23             THE COURT:  All right.  Thank you.

24             So with respect to the waiver let me just walk

25   through this.

1             So Ms. Hassan, you do have the right to have

2     participated in this hearing in person so you could have

3     come up to Minnesota.  It's pretty cold here right now, but

4     you could have come up to Minnesota and been here in person.

5             Do you understand that you had the right to be at

6     this hearing in person?

7             THE DEFENDANT:  Yes.

8             THE COURT:  All right.  And your Counsel, Mr.

9     Sicoli, filed a letter with the Court stating that you were

10    agreeable to appear via video instead of being here in

11    person.

12            Did you know that he filed that letter?

13            THE DEFENDANT:  Yes, I did.

14            THE COURT:  And did you understand that you had

15    the right to be here but you were choosing to participate

16    via video conference in any event?

17            THE DEFENDANT:  Yeah.  I agreed to it.

18            THE COURT:  Okay.  And do you have any concerns

19    about appearing over the video instead of in person right

20    now?

21            THE DEFENDANT:  No, I don't.

22            THE COURT:  Okay.  And you're voluntarily giving

23    up your right to be here in person, is that right?

24            THE DEFENDANT:  Yeah.

25            THE COURT:  No one's forced you to stay -- stay

1     away and said that you can't come here in person, right?

2                THE DEFENDANT:  No.

3                THE COURT:  Okay.

4                THE DEFENDANT:  Yeah.  I'm good.

5                THE COURT:  Okay.  All right.

6                THE DEFENDANT:  Yeah.

7                THE COURT:  Thank you.

8                Mr. Kovats, do you think that covers it from the

9     Government's perspective?

10               MR. KOVATS:  I do, Your Honor.  Thank you.

11               THE COURT:  All right.  Thank you.

12               Well then I will let the Government proceed with

13    its witness.

14               MR. KOVATS:  Your Honor, before I start, I'd like

15    to -- and maybe it's a little bit out of but just to do the

16    bookkeeping first, if I may offer Government's Exhibits 1

17    and 2 into evidence.

18               Exhibit 1 is the latest report from Dr. Correa

19    dated -- well, it's accompanied by correspondence from the

20    Marshal at FMC, Carswell dated April 29th, 2019.

21               If I could offer that as Exhibit 1.  And if I

22    could also contemporaneously make a motion to seal that

23    based on the content that's contained therein.

24               So if I could offer Exhibit 1 into evidence and

25    have it be sealed.

1          THE COURT:  Is there any objection?

2          MR. SICOLI:  We have no objection and would also

3    join in the -- under the seal, Your Honor.

4          THE COURT:  All right.

5          Then Exhibit 1 will be received and admitted into

6    evidence and I will grant the motion to seal Exhibit 1.

7          Does that mean you also need these proceedings

8    sealed as well or are you making a motion along those lines?

9          (Off-the-record discussion.)

10         MR. KOVATS:  No, Your Honor.  Thank you.

11         THE COURT:  Okay.  Thank you.

12         MR. KOVATS:  And then we would offer Exhibit 2,

13   which is the Curriculum Vitae of Dr. Correa who's the

14   Government's witness here today.

15         MR. SICOLI:  No objection, Your Honor.

16         THE COURT:  Okay.  Thank you.  Then Exhibit 2 is

17   received and admitted.

18         MR. KOVATS:  Thank you, Judge.

19         THE COURT:  Thank you.

20                    DIRECT EXAMINATION

21   BY MR. KOVATS:

22   Q.  All right.  Good morning, Dr. Correa.

23   A.  Good morning.

24   Q.  All right.  So I'd like to start -- I'll start with a

25   few biographical questions for you.  Where do you work?

1    A.  I work at the Federal Medical Center (FMC), Carswell.

2    Q.  And how long have you been there?

3    A.  I've been here as a forensic psychologist since May,

4    2016.

5    Q.  Now, as a forensic psychologist at FMC, Carswell, you're

6    employed by the Bureau of Prisons, is that right?

7    A.  Yes.

8    Q.  And how would you describe your position there?

9    A.  My primary duties are to do evaluations and testing for

10   forensic cases and write reports and provide expert

11   testimony as needed.

12   Q.  If you could, could you walk us through the education

13   and training that you have accomplished both prior to and

14   while employed as a forensic psychologist for the Bureau of

15   Prisons?

16   A.  Yes.  I have a bachelor's degree in psychology from New

17   York University and I have a master's degree in psychology

18   from the University of North Texas and a Ph.D. in clinical

19   psychology, also, from the University of North Texas.

20           I have several publications, and peer-reviewed

21   journals and book chapters relating to forensic assessment,

22   particularly the psychological testing of Defendants.

23   Q.  And I see from your CV before that -- before you were

24   employed at FMC, Carswell, that you were also employed at

25   the MDC in Brooklyn?

1    A.  Yes.

2    Q.  Now have you -- obviously you're here today because you

3    performed a competency evaluation of the Defendant, Ms.

4    Hassan.

5            How many times have you performed similar

6    assessments to determine competency of a Defendant?

7    A.  Competency, roughly 100 to 120.

8    Q.  And those are instances where you did an examination of

9    a Defendant and then produced a report in which you provided

10   your belief as to that Defendant's competency?

11   A.  Yes.

12   Q.  Okay.  And how often have you testified in court like

13   you are today or at least -- excuse me, by VTC in court on

14   issues of competency?

15   A.  Approximately 10 percent of all competency cases.

16   Q.  How would you describe your role in the process as it

17   stands today?

18   A.  My role typically is to meet with the Defendant as soon

19   as they arrive to FMC, Carswell and perform an initial

20   mental health screening.

21           The screening is for the purposes of initial

22   diagnostic impressions, as well as to determine their needs

23   and appropriate housing situations for them while they're

24   here undergoing the evaluation process.

25           Additionally, I am part of the mental health

1    treatment team which meets approximately once a month and as

2    needed with each Defendant.

3          I am in charge of doing individual testing and

4    interviewing with the Defendants on my caseload, as well as

5    record review and any collateral interviews from other

6    mental health professionals that have worked with them

7    before, sometimes that includes family members, sometimes

8    that includes attorneys.  And ultimately at the end of each

9    evaluation I provide a report detailing the results of the

10   evaluation and like today testimony, if needed.

11         THE COURT:  Mr. Kovats, was the witness sworn in?

12         MR. KOVATS:  I don't believe the witness was sworn

13   in, Your Honor, that's a great observation.

14         THE COURT:  All right.  So let me -- let me swear

15   you in, Ma'am, and then we can discuss how we want to cover

16   all that.

17         If you could raise your right hand, please.

18         Do you affirm that the testimony you're about to

19   give and the testimony that you have given is true and

20   correct under penalty of perjury?

21         THE WITNESS:  I do.

22         THE COURT:  All right.  Thank you.  You may put

23   your hand down.

24         Does either Counsel object to the oath that I've

25   just given and that would cover the testimony previously

1    given?

2              MR. SICOLI:  We have no objection, Your Honor.

3              THE COURT:  All right.  Thank you.  Mr. Kovats?

4              MR. KOVATS:  No, Your Honor.  Thank you.

5              THE COURT:  Okay.  Thank you.

6    BY MR. KOVATS:

7    Q.  And the fact that the oath has now been administered,

8    does it change any of your answers to the questions I've

9    asked so far?

10   A.  No it doesn't.

11   Q.  All right.  Now you indicated in brief the process by

12   which a competency evaluation is undertaken.  I think we'll

13   talk a little bit about that in greater detail in a moment,

14   but just zooming out a little bit, as you've been conducting

15   these have you found people to be both competent and not

16   competent to stand trial?

17   A.  Yes.  Both.

18   Q.  And, in fact, that's happened in this case, hasn't it?

19   A.  Yes, it has.

20   Q.  All right.  So now I want to talk a little bit about the

21   competency evaluation of Ms. Hassan.

22              And so if you would, if you could describe for us

23   sort of the sources of information that you relied upon when

24   conducting your evaluation of her be it interviews, other

25   reporting, et cetera.

1    A.   When Ms. Hassan arrived at FMC, Carswell she had already

2    undergone a competency evaluation at a previous BOP

3    facility, so I relied on records from that evaluation, as

4    well as medical records from around that time and BOP

5    records from the psychology department at her previous

6    placement.  I also relied on hospital records for Ms. Hassan

7    and discovery in her criminal case.

8         When she arrived here I did some individual

9    testing with Ms. Hassan.  I also consulted with the

10   psychiatrist that met with her, social workers, the rest of

11   the mental health treatment team to compile their

12   observations --

13        (Video ended at 10:20 a.m.)

14        THE COURT:  All right.  Well, the video has cut

15   off, obviously, so I think we will have to call I.T. to get

16   that reset.  So we'll recess for a short period of time.

17        MR. KOVATS:  Very well.  Thanks, Your Honor.

18        THE COURT:  Thank you.

19        THE CLERK:  All rise.

20        (Recess at 10:27 a.m.)

21        THE COURT:  We are back on the record in United

22   States versus Hassan, Case Number 18-CR-26 PJS/ECW.  It

23   looks like we have our I.T. issues sorted out.

24        Ms. Hassan, Dr. Correa, can you still hear us?

25        THE WITNESS:  Yes.

```
 1                THE COURT:  Okay.  Thank you.

 2                So, Mr. Kovats, I'll let you continue with your

 3      direct examination.  And the witness is, of course, still

 4      under oath.

 5                MR. KOVATS:  Thank you, Your Honor.

 6      BY MR. KOVATS:

 7      Q.  Dr. Correa, I think when we were cut off I think I asked

 8      you to describe procedures you used in conducting the

 9      evaluation and you had indicated that you had consulted and

10      reviewed previous BOP reports, records of previous

11      treatment, there's discovery in the criminal case and that's

12      where my notes end and it might be where we got cut off.

13                And so if I could re-ask that question and have

14      you continue with your answer.

15      A.  Okay.

16      Q.  Thank you.

17      A.  Yes.  So all of the -- everything you just summarized is

18      accurate.

19                When Ms. Hassan arrived to FMC, Carswell I also

20      conducted individual testing with her and individual

21      clinical interviews.

22                I consulted with the rest of her mental health

23      treatment team, which includes psychiatry, social work,

24      other psychologists to understand their clinical impressions

25      of Ms. Hassan.
```

1           And particularly for this most recent evaluation

2       period I relied heavily on records from her competency group

3       facilitator, who is also a licensed clinical psychologist.

4       And I relied heavily on Ms. Hassan's really excellent

5       participation and ability to showcase her factual knowledge

6       and competency restoration group.

7    Q.  Now you had mentioned that you had consulted with her --

8       with Ms. Hassan's mental health treatment team.  Were you a

9       part of that team?

10   A.  Yes.

11   Q.  All right.  So now I want to talk a little bit about the

12      procedures you use in conducting the evaluation.  And I

13      noticed in your report that you administered two

14      psychological tests, including the Minnesota Multiphasic

15      Personality Inventory-2 and the Evaluation of Competency to

16      Stand Trial-Revised.

17          So before we talk about those, I also wanted to

18      zoom back in time to the previous examination, the forensic

19      evaluation done at SeaTac.

20          And in that Dr. Low wrote a report.  Did you have

21      a chance to look at Dr. Low's report?

22   A.  Yes, I did.

23   Q.  And in there I believe that Dr. Low used different

24      tools.  And my notes indicate -- I'm trying to find it in

25      the report, that she used the Revised Competency Assessment

1        Instrument as well as a Personality Assessment Inventory and

2        some other tools.

3              Could you explain -- well, first, did you get the

4        benefit of those assessments?  And then my follow-on

5        question, if I make it compound is why you didn't do those

6        assessments yourself a second time?

7    A.  So to answer the first part of your question, I was able

8        to review the results of Dr. Low's testing.  And to answer

9        the second part of your question, I administered different

10       tests purposely.  And the reason for doing so is

11       multifaceted.

12             So I chose tests that essentially capture the same

13       concepts but using different questions.

14             So, first of all, it's expected that the results

15       from Dr. Low's testing would stay pretty consistent if an

16       individual were to retake the test, especially within the

17       relatively short time period between Dr. Low's evaluation

18       and my evaluation.  So we expect the results to stay pretty

19       consistent for those types of tests.  And I always strive to

20       give different tests because of something called the

21       practice effect.

22             So even though we expect the results to stay

23       pretty consistent for a personality test, once an individual

24       has already seen the questions, they might inadvertently

25       respond in a different way the second time around and that

1    might artificially skew their results.  So you just always

2    want to give them fresh questions.

3            And that's why I used a different personality test

4    and that's why I used a different competency test for Ms.

5    Hassan.

6    Q.  Is it fair to say that all of the testing that was

7    previously done at SeaTac, however, was before you and you

8    were able to review it and consider it when making your

9    competency determination?

10   A.  Yes.

11   Q.  All right.  So you had indicated that you collected

12   medical information -- mental health information and some

13   legal background about Ms. Hassan.

14           Did you also have an opportunity to spend time

15   with Ms. Hassan?

16   A.  Yes.

17   Q.  Okay.  Do you recall how long she's been at FMC,

18   Carswell?

19   A.  She arrived at our facility on February 13th, 2019.

20   Q.  Now I was going to ask you how many times that you've

21   had the opportunity to meet with her, but if you've both

22   been in the same space for approximately a year, maybe

23   there's a better way for you to describe for us the amount

24   of time you spent with her.

25           And so I would just offer up for you the

1    opportunity to sort of put that in context for us?

2    A.  Sure.

3         I'll explain -- I'll start off by explaining that

4    when Ms. Hassan initially arrived at our facility she was

5    placed on our most secure mental health housing unit because

6    at that point her clinical presentation was very different

7    than what her current symptom presentation is.

8         And so at that point in time, Ms. Hassan needed an

9    increased level of monitoring, she needed an increase level

10   of staff observation of her.  So during those times, I was

11   meeting with her at least once a week and checking on her

12   progress.

13        Once she transitioned out of that housing unit due

14   to symptom improvement and she went to our more general

15   population mental health housing unit I had relatively less

16   contact with her, but I had contact with her during her

17   monthly treatment team meetings.

18        Also she was able at that point to become involved

19   in additional psychology contacts, such as her weekly

20   competency restoration class.

21        Informally I met with her in the hallway several

22   times going up to the daily treatment team meetings.  Even

23   though it wasn't her time to be interviewed by the treatment

24   team, she could always approach me to ask me questions, she

25   could write me letters and requests if she had any

1    questions.

2              And towards the end of her most recent evaluation

3    period we met several times for a prolonged testing session

4    individually.

5    Q.  How would you characterize the amount of time you spent

6    with Ms. Hassan as it might compare to other Defendants that

7    are before you for a competency determination?

8    A.  Just due to the fact that she's been here since

9    February, by default it would be a lot more than a typical

10   Defendant.

11             Usually our competency cases stay here for

12   30 days.  Usually at a maximum they're here for four months.

13   And Ms. Hassan has been here for a considerably longer.

14   Q.  If you would, if -- could you describe how Ms. Hassan

15   presented to you when she first arrived or at least when

16   you first encountered her after her arrival in February of

17   2019?

18   A.  Around that time I would classify her as very highly

19   symptomatic.

20             She was having serious symptoms of psychosis,

21   which include hallucinations.  Her behavior was very

22   disorganized.  Her thought process was difficult to follow.

23   And it was considerably influenced by delusional thought

24   content, which is -- which are thoughts that are not based

25   in reality.

1      She was very focused on being possessed by Jinn,

2 which are sort of demonic spirits.  She thought that she was

3 constantly being taken over by that.

4      And her attempts to combat what she believed was a

5 demonic possession resulted in --

6      (Court reporter interrupted.)

7      THE COURT:  You can add a little bit, Ma'am, if

8 you could just repeat your statement.

9      THE WITNESS:  Okay.

10 A.  (Continuing)  Her attempts to combat what she believed

11 was a demonic possession resulted in 8 to 12 hours of

12 prayer, obsessive prayer daily.  And so her daily activities

13 were basically governed by these symptoms that she was

14 having.

15      Nowadays, her symptom presentation is very

16 different.  I would consider all of those things that I just

17 talked about to be in remission.  She doesn't show any of

18 these symptoms presently.

19 Q.  Now prior to your most recent report in which you render

20 your opinion that she's currently competent to stand trial,

21 it sounds like you had a good opportunity to spend time with

22 her and discuss with her things related to her case, is that

23 right?

24 A.  Yes.

25 Q.  And her personal biography and the like?

1    A.  Yes.

2    Q.  How would you describe her ability to recount, for

3    example, her biographical information effectively and

4    accurately to you?

5    A.  I would describe it as excellent.

6         She is a very good historian and can accurately

7    remember a lot of minute details.  And I believe that she

8    can -- I believe that she can accurately recount a lot of

9    things both in her personal history and case-related

10   materials.

11   Q.  Do you believe she has a good understanding of her --

12   her mental health history and her current prognosis?

13   A.  I think that over the course of her time at FMC,

14   Carswell she has steadily gained more insight into her

15   mental health symptoms and her -- as well as her mental

16   health prognosis in the future.

17        It's very common that individuals when they are

18   first diagnosed with something have very limited insight and

19   acceptance into the reality of their illness.  But Ms.

20   Hassan has steadily been able to assimilate and learn about

21   what her diagnosis means and the potential manifestation of

22   symptoms in the future.

23   Q.  You talked about diagnosis information.  How would you

24   characterize her current diagnosis?

25   A.  Her current diagnosis was updated for this most recent

1        report.

2                Both Dr. Low and I had originally diagnosed Ms.

3        Hassan with schizophrenia.  And I've revised that in the

4        most recent report because of her symptom presentation over

5        the course of this essentially past year that she's been at

6        Carswell.

7                I don't believe that she has schizophrenia

8        anymore.  I believe her symptoms and the natural course of

9        her symptoms are better explained by some kind of mood

10       disorder with a psychotic symptom component.

11               And what I mean by that is that schizophrenia in

12       itself is a very chronic condition, but Ms. Hassan has had

13       times of symptom remission without the benefit of medication

14       as a treatment.

15               And so the fact that her symptoms naturally wax

16       and wane tells me that what she has is not schizophrenic,

17       it's more of an episodic mood disorder.

18               So she may have depressive episodes or maybe manic

19       episodes consistent with a bipolar type of disorder.  And

20       when she's having these active episodes for her they're also

21       coupled with symptoms of psychosis.

22               So her symptoms are only active during these mood,

23       meaning depressive, or manic episodes.  And when she

24       naturally transitions out of those mood episodes her

25       psychotic episodes disappear and she enters a period of

1    remission.

2    Q.  And you had indicated, at least if I understood your

3    testimony, that these issues have resolved without the use

4    of medication?

5    A.  Yes.  That is very typical of these episodic mood

6    disorders where there will be an active period that lasts

7    for a certain amount of time.  It's not predictable, but

8    there will be an active period and then a period of

9    remission and people will go in and out of those two

10   states.

11   Q.  Can it also be treated with medication?

12   A.  Yes.

13   Q.  And did Ms. Hassan at some time take medication to help

14   alleviate the symptoms of her diagnosis?

15   A.  She briefly took medication here at FMC, Carswell.  And

16   I know that she had taken medication prior to arriving here

17   when she was hospitalized.

18           But for the majority of her time here at Carswell

19   she elected not to take medication and just let her symptoms

20   run their natural course.

21   Q.  Now, I'd like to, if we could do -- if we could zoom out

22   a little bit and maybe try to knit together some parts of

23   your testimony that explain the fluctuations in Ms. Hassan's

24   competency, at least as it relates to her ability to stand

25   trial.

1          And so we had the opinion from Dr. Low that she

2     was competent.  And then we had a report that you wrote

3     earlier this year in which you had the opinion that Ms.

4     Hassan was not then presently competent.  And now we have

5     the most recent report in which you conclude that she is.

6          And if you could describe for us like that

7     trajectory and what explains it.

8     A.  Yes.  And that's why it's important to understand the

9     nuances of Ms. Hassan's updated diagnosis because the

10    symptom fluctuation and the competency fluctuation as a

11    result is entirely typical for somebody who had episodic

12    mood disorder with psychosis.

13         So when she was evaluated by Dr. Low, Ms. Hassan

14    was -- and I'm just referencing Dr. Low's report, she

15    classified Ms. Hassan as having schizophreniform disorder

16    with good prognostic features.

17         Meaning she had a good ability to bounce back from

18    her symptoms and eventually reach a level of high

19    functioning and some type of remission.

20         And so at the time of Dr. Low's evaluation Ms.

21    Hassan was doing relatively well in terms of symptom

22    presentation.

23         After Dr. Low's evaluation, Ms. Hassan ended up

24    being hospitalized for mental health reasons.

25         And those hospital records indicated that she was

1    engaging in self-harm acts directly as a result of

2    delusional thought content.

3              She thought that she had things implanted under

4    her skin and she had to dig into her skin to remove them.

5    So she was very highly symptomatic and very highly

6    delusional.

7              In that state her competency was also affected

8    because of her thought process not being rational and being

9    so fixated on delusional thinking.

10             She was still in that state when she arrived to

11   FMC, Carswell, which is why we put her in our mental health

12   high observation housing unit.

13             She was there for most of her initial 30-day

14   evaluation at FMC, Carswell and started to show minor

15   symptom improvement towards the end of those 30 days.

16             And that's when she started consenting to

17   medication to help those symptoms, but she only took

18   medication briefly.  She reconsidered it and just decided to

19   see what would happen with her symptoms if she refrained

20   from medication, which is her right to do.  And she had

21   several conversations with me, the psychiatrist, and the

22   rest of her treatment team about the possible ramifications

23   of her decision to not take medication.

24             But eventually Ms. Hassan's symptoms subsided,

25   which is just the typical evolution of these types of

    1    disorders.

    2                So Ms. Hassan's symptoms subsided.  She was able

    3    to transition to the least -- to the least secure housing

    4    unit that our mental health defendants typically reside on.

    5    She became much more involved in activities.  Her thought

    6    process was rational and not governed by delusions anymore.

    7                I even checked in with her because she asked me to

    8    tell her if I thought that at any point she should start

    9    taking medication again to guarantee that she could stay

   10    competent.

   11                And so I checked in with her about two months,

   12    maybe, before her evaluation period officially ended to do

   13    some informal competency testing.  And at that point in

   14    time, I mean, I thought that she had a good rational

   15    understanding, factual understanding, good ability to

   16    consult with others about her case.  And at that point in

   17    time I told Ms. Hassan that she didn't necessarily need to

   18    take medications because her symptoms were not active.  But

   19    then we also had the conversation of possible -- of the

   20    possibility of her symptoms coming back and how medication

   21    could help prevent future exacerbations of symptoms.

   22                And so in that sense she's been coached and she

   23    understands certain things to look out for when she -- that

   24    would indicate her symptoms are coming back.

   25    Q.  Now you indicated that these -- I think your diagnosis

1    included the term episodic?

2    A.  Yes.

3    Q.  So is it possible that Ms. Hassan might suffer a

4    relapse?

5    A.  It's possible.  Especially since she's already had more

6    than one episode and by nature these things are recurring.

7          And that's why I tried my best to let her know --

8    let her know that these things are episodic and also talk to

9    her about things that she could look out for that would

10   trigger the -- that would identify for her the beginning of

11   another psychotic episode and at that point if she notices

12   any of these simple things like more -- like more of a

13   depressed mood, isolation.

14         For her, frequent -- headache frequency is a big

15   indicator.  If she starts feeling the obsessive need to pray

16   again, or starts worrying about demonic possession again,

17   those are times when she could reach out for help to sort of

18   stop the symptom progression before it gets too far.

19   Q.  All right.  So were you able to reach any conclusions

20   about Ms. Hassan's competency?

21   A.  Yes.

22   Q.  And specifically her ability to understand the nature

23   and consequences of the proceedings against her?

24   A.  Yes.

25   Q.  And her ability to assist properly in her own defense?

1      A.  Yes.

2      Q.  And what were those conclusions?

3      A.  At the present time she is competent on all factors that

4      you mentioned.

5              She has an excellent rational understanding of her

6      case.  She has always had an excellent factual understanding

7      of courtroom procedures and she speaks very reasonably with

8      me about case information and her decision-making process is

9      very reasonable and reality-based.

10             And so I expect that if that's how she presents

11     her case when others ask about it, that those should easily

12     translate into meetings that she has with her attorneys.

13     Q.  And without getting in any conversations she may have

14     had with her attorneys, do you feel that she -- or do you

15     believe she understands what her attorney's role in the

16     process is?

17     A.  Yes.

18     Q.  In the criminal justice process?

19     A.  Yes.

20     Q.  And the role of the Court?

21     A.  Yes.

22     Q.  The role of the Prosecutor?

23     A.  Yes.

24     Q.  And do you think she understands her own role in her --

25     any criminal trial or the criminal proceedings that might

```
 1    follow from today?

 2    A.  Yes.

 3              MR. KOVATS:  Your Honor, I'll conclude there.

 4              THE COURT:  All right.  Thank you, Mr. Kovats.

 5              MR. KOVATS:  Thank you.

 6              THE COURT:  Mr. Sicoli?

 7              MR. SICOLI:  Thank you, Your Honor.

 8                         CROSS-EXAMINATION

 9    BY MR. SICOLI:

10    Q.  Good morning, Doctor.

11    A.  Good morning.

12    Q.  So I want to first talk about your first evaluation

13    which was in March of 2019, if I may?

14    A.  Yes.

15    Q.  All right.  So at that time you found that she was

16    incompetent to stand trial, is that correct?

17    A.  Yes.

18    Q.  Your diagnosis at that time was schizophrenia multiple

19    episodes, which you define as currently in partial

20    remission, is that true?

21    A.  Yes.

22    Q.  Is that what -- and can you describe what you meant by

23    that?  What is, schizophrenia multiple episodes currently in

24    partial remission?  Can you define that for us?

25    A.  Yes.  Schizophrenia is a chronic mental health
```

1     condition.

2          It is characterized by two primary symptoms.  The

3     most obvious and typical symptoms are hallucinations, which

4     are experiences such as hearing voices or seeing visual

5     phenomena that aren't actually there.

6          The second typical symptom of schizophrenia is a

7     delusional thought process.  And delusions essentially are

8     fixed false beliefs.

9          So for Ms. Hassan she believed consistently that

10    she was being demonically possessed by Jinn.

11         And so those were two of the major symptoms of

12    schizophrenia/psychosis that Ms. Hassan was exhibiting when

13    she first arrived here.

14         Other symptoms were thought disorganization,

15    behavioral disorganization.  Her behavior was highly

16    influenced and governed by her delusional thoughts to the

17    extent that she spent most of her day praying away this

18    demon that she believed was possessing her.

19         And she occasionally refused to eat because of her

20    delusional thought process.

21         At that point in time, given that Dr. Low had

22    diagnosed her with schizophreniform disorder, that appeared

23    to be the logical diagnosis for Ms. Hassan at that point in

24    time.

25         Now schizophreniform disorder is basically

1    schizophrenia without -- with a different time caught off of

2    symptoms.

3            So Ms. Hassan, with her age, we typically see in

4    individuals a first psychotic episode or manifestation of

5    these schizophrenia-type symptoms.

6            At around age 20 to 25 in females, that's

7    typically their first manifestation of these types of

8    symptoms.

9            And so when Dr. Low saw that Ms. Hassan was

10   exhibiting these symptoms, she labeled them as

11   schizophreniform disorder because schizophreniform has a

12   six-month cutoff for experiences of these symptoms.

13           So basically when Dr. Low evaluated her, Ms.

14   Hassan had not yet had six months worth of those symptoms

15   consistently.

16           When I evaluated her she had surpassed the

17   six-month cutoff.  And so initially that seemed like the

18   natural progression.

19           And obviously her symptoms continued to change

20   throughout her time here at Carswell and that's why it

21   became -- it became necessary to further refine her

22   diagnosis over the time that she was here at Carswell.

23   Q.  And it's certainly possible she was having these

24   episodes prior to going to SeaTac and Washington, is that

25   correct?  You wouldn't have any idea about that?

1    A.  Right.  Because there were no prior mental health

2    records.

3    Q.  Right.  So she could have been suffering from these

4    episodes a while back.  It doesn't have to be 20 years old,

5    it can be a little bit before that, I assume, correct, that

6    she could be having these episodes?

7    A.  Yeah.  Yeah.  Absolutely.

8    Q.  Now, in your first evaluation you found her incompetent,

9    but she did understand the legal procedure -- proceedings at

10   that time, is that correct?

11   A.  Yes.  She has always had a very good factual knowledge.

12   Q.  I mean, she understood the players, she understood the

13   prosecutor's role at that time, is that correct?

14   A.  Yes.

15   Q.  And she understood her defense attorney's role, is that

16   correct?

17   A.  Yes.

18   Q.  Okay.  And she also understood what the Judge is

19   supposed to do and what the Judge's role is, is that

20   correct?

21   A.  Yes.

22   Q.  So as far as her knowledge of the court system, that

23   wasn't what really made you determine that she was

24   incompetent to stand trial in your March 2019 evaluation, is

25   that correct?

1    A.  Yes.  That's accurate.

2    Q.  In fact, I think the main gist of -- and correct me if

3    I'm wrong, the main gist of your March 27th evaluation

4    conclusion that she was incompetent was that she really

5    couldn't talk to her lawyers about the case adequately to

6    provide us with some input because she had this Jinn that

7    was going on, and she would pray all the time, and she was

8    restricted as far as what she would be able to do with her

9    attorneys at that point, is that correct?

10   A.  Yes.

11   Q.  Okay.  So it had more to do with the fact she couldn't

12   assist her attorneys rather than knowing the system and

13   knowing who the players were, is that correct?

14   A.  Yes.  That's accurate.

15   Q.  Okay.  Now, she moved from the secure unit which I think

16   you defined in the report as M3, is that correct?

17   A.  Yes.

18   Q.  The secure unit?  And she used to the M1 unit which is

19   the restrictive unit, is that correct?

20   A.  Yes.

21   Q.  And that was, I believe if I'm reading the report

22   correct, that was March 25th of 2019?

23   A.  Let me just reference the report.  Do you have the page

24   that it's on by any chance?

25   Q.  Now you're asking me a difficult question, but I'll see

1     if I can find it.

2     A.  I just found it.  It's March 25th, you're right.

3     Q.  Okay.  And by that time -- or right around that time she

4     stopped taking her meds, is that correct?

5     A.  She actually stopped taking -- she was sporadically

6     taking medication.

7     Q.  Do you know how long she was on medication, just as a

8     ballpark figure?

9     A.  I don't know exactly how long, but I do know from

10    conversations I had with her psychiatrist that she never

11    took it consistently enough for it to make a difference.

12          So a lot of these mental health medications have

13    to build up in your system for an extended period of time,

14    weeks, sometimes a couple of months.

15          And the way Ms. Hassan was taking a dose here and

16    there never allowed it to build up in her system enough to

17    affect symptoms.

18    Q.  So her --

19    A.  So even when she was taking medication, she was taking

20    sort of a subclinical dose.

21    Q.  So in your second evaluation where you find her

22    competent, her improvement in her symptoms was certainly not

23    due to any medications is what you're saying, is that

24    correct?

25    A.  Right.


LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1    Q.  Okay.  Now, in the second evaluation, again, she has the
2    same understanding about the court system, she understands
3    what's going on, correct?
4    A.  Right.
5    Q.  But the difference now is that she doesn't feel that
6    she's possessed by the Jinn anymore, is that correct?
7    A.  Yes.
8    Q.  And she's not praying for 8 to 12 hours a day or trying
9    to deal with the Jinn in her system for 8 to 12 hours a day,
10   is that correct?
11   A.  Right.
12   Q.  And she's also showing more interest in activities,
13   which is also a good thing, right?
14   A.  Uh-huh.  And she's able to function without the extended
15   observation and help from staff members that she needed when
16   she was on the M3 housing unit.
17   Q.  Now, you said that she -- that you modified the
18   diagnosis to say that it's a mood disorder with some --
19   A.  Yes.
20   Q.  -- psychotic features?
21   A.  Yes.
22   Q.  You also in your October 25th, 2019, evaluation, your
23   diagnosis it says in the report is unspecified schizophrenia
24   spectrum --
25   A.  Uh-huh.

1    Q.  -- and other psychotic disorder?  Isn't that what you

2    say in the report?

3    A.  Yes.  And I can explain why --

4    Q.  Yes.  Please do.

5    A.  Okay.  So I can explain that label.

6          Unspecified schizophrenia spectrum and other

7    psychotic disorder is essentially a catchall umbrella

8    diagnosis.

9          And so for Ms. Hassan, since the only mental

10   health records we have of her psychotic episodes are from

11   the time she was at SeaTac forward, there's just not enough

12   information to clearly delineate whether her episodic mood

13   disorder is a major depressive disorder with psychotic

14   features or whether it's more of a bipolar-type episodic

15   mood disorder with psychotic features.

16         And so since I don't have enough evidence of what

17   her typical mood episodes are, if they're depressive

18   disorders, if they're manic episodes or if they're a mix, I

19   just can't pave a more accurate classification than the

20   umbrella diagnosis of unspecified schizophrenia spectrum and

21   other psychotic disorder.

22   Q.  Is there -- is there a difference in the analysis if

23   it's a mood disorder that's related to depression versus

24   bipolar disorder?

25   A.  What do you mean a difference in analysis?

1    Q.  Well, is there -- would there be a difference in

2    analysis, first of all, about her competency depending upon

3    what she has, whether it's a depressive mood disorder or

4    bipolar disorder, would that affect the issue of competency

5    is the first question?

6    A.  Potentially.  What most -- let me just say that what

7    those labels sort of to clarify is more of the treatment

8    that would be involved in a depressive disorder versus a

9    bipolar disorder.  So they involve different medications,

10   different clinical interventions potentially.

11          What is not affected is the fact that we know that

12   when Ms. Hassan has these mood episodes, whatever they might

13   be, that they affect her so severely that they've impacted

14   her competency before.

15   Q.  So if she has these episodes again, and right now she

16   doesn't, right?  She's not having these episodes right now,

17   is that correct?

18   A.  Right.

19   Q.  But if she did have these episodes again of the same

20   variety where she has some of the same issues, it's your

21   opinion that she would be incompetent at that time?

22   A.  It would depend on a lot of factors.

23          It would depend on whether the episode was caught

24   early so interventions can be made at that point.

25          It would depend on the severity of the episode

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

 1    because they all potentially could be different.

 2             And there's also no way to predict when an episode

 3    would -- would happen if it does.  And so there are just a

 4    lot of unknowns in that situation.

 5    Q.  Now when I asked you a question about if it would affect

 6    competency depending on the diagnosis, whether it's bipolar,

 7    whether it's depression involved you said possibly

 8    initially.

 9    A.  Yeah.

10    Q.  So what do you mean by that, though?

11             I mean, would it possibly -- so that means to me

12    that it possibly would affect the issue of competency

13    depending upon what the diagnosis is?

14    A.  So the issue of competency by definition is fluid.  And

15    that's why we can see that Ms. Hassan's competency has

16    changed over time.

17             Each time her mental status changes would require

18    an individual reassessment of her competency-related

19    abilities at that point in time.

20             And that's the most clear, accurate description

21    that I could make about what it would take to make a

22    well-informed judgment of what her competency skills are

23    like at any given point in time.

24    Q.  All right.  And -- and you said that you've given her

25    some information to sort of evaluate whether she's maybe

1    going into one of these episodes so that she can recognize

2    it, is that correct?

3    A.  Yes.

4    Q.  All right.  Does it make a difference, though, in her

5    ability to recognize an episode happening?

6         Does it make a difference if the diagnosis is

7    major depression with psychotic features versus bipolar

8    disorder with psychotic features?

9    A.  So there might be different medications that a

10   psychiatrist would choose to give.

11        Overall the systems that seem to be affecting Ms.

12   Hassan's competency, however, are the psychotic symptoms.

13        And so those symptoms are separate from if she

14   were to have a depressive disorder, likely a psychiatrist

15   would give her an antidepressant.

16        If she were to have a bipolar disorder they likely

17   would give her a mood-stabilizing medication.

18        However, since the major symptoms affecting her

19   functioning are psychotic symptoms, the mood episodes are

20   really more of a -- the mood symptoms are really more of a

21   nuance.

22        Likely overall the medication targeting the

23   psychotic symptoms would be the same things regardless of if

24   it was a bipolar or a depressive mood episode.

25   Q.  How would Ms. Hassan -- if she's having one of these

1    episodes, though, and she starts having these delusions or

2    hallucinations, how would she be able to recognize that if

3    she's suffering from a mental illness?

4    A.   The key is to notice things in the early stages.  And

5    that's a conversation that I've had with her about how to

6    best maintain her competency.

7         And so she can -- if she catches any differences

8    in her thinking or in how she feels in the early stages,

9    then it's much easier to stop symptom progression before it

10   gets -- before it gets so advanced that she doesn't know

11   what's going on anymore.

12        Aside from that, I mean, in the past when she's

13   had these major episodes and psychotic symptoms there have

14   been people around who have intervened and have basically

15   gotten her to treatment when she can't get herself there.

16   Q.   And this is may be a naive question but because we don't

17   know what exactly she's suffering from, even though it's a

18   mood disorder but we don't know if it's a bipolar -- if it's

19   sort of the bipolar disorder or the major depression,

20   wouldn't it make sense to have a further evaluation of her

21   so that you can get a handle on what the diagnosis is rather

22   than this sort of unspecified diagnosis?

23   A.   I think for the purposes of competency and for the

24   purposes of triggering her most -- the symptoms that most

25   affect her functioning, the key is knowing that whatever

1    mood symptoms are there, the psychotic episodes are the

2    really major ones that need to be targeted and need to be

3    put in remission for her to be able to function how she is

4    now when she's better.

5            The rest is sort of a nuance for a prolonged

6    treatment of mood episodes, but they're not what affects her

7    on a day-to-day basis.

8            What affects her functioning daily when she has

9    them are the hallucinations, and the delusions, and the

10   psychotic symptoms.

11           And that part of the diagnosis is consistent

12   regardless of what the mood episodes may be.

13   Q.  And is it your -- and obviously we respect Ms. Hassan's

14   wishes on medication but as a -- and we know you're not a

15   psychiatrist, but as a psychologist do you recommend

16   preemptive sort of taking antipsychotic medication on a

17   regular basis to prevent these psychotic episodes or it

18   is -- in your opinion is it okay to just sort of wait until

19   somebody has those psychotic episodes before having a

20   regimen of medication?

21   A.  Of course for someone like Ms. Hassan who is in a -- in

22   a place where right now she's relatively healthy, she has

23   the right to refuse any kind of treatment and have that be

24   respected.

25           In the conversations I've had with her about how

1    to best maintain her competency, of course I've mentioned

2    that medication can help avoid any future symptoms that --

3    exacerbations but, I mean, that's not a guarantee because by

4    the nature of these episodic conditions, we just never know

5    when something is going to happen to exacerbate the symptoms

6    again.  Sometimes it's unrelated, it just has to do with

7    what an individual's brain chemistry is doing at the time.

8           So there are ways for people who don't wish to

9    take medication to just take care of themselves and notice

10   when they really need to seek more help other than what

11   they're doing just on a regular daily basis when they're

12   feeling healthy.

13          And that's why I had a multifaceted conversation

14   with Ms. Hassan about the benefits of medication, keeping

15   things stable, but also if she doesn't want to take

16   medication then she just needs to be aware of catching her

17   symptoms early if they happen again and at that point make a

18   decision about, is this the point that I reach out to -- for

19   medication, especially if she's still undergoing some sort

20   of court process and she really wants to maintain her

21   competency throughout that.

22          We've had conversations about all of these things,

23   and I think that Ms. Hassan is not in a position where we

24   can force her to take medication against her will, so the

25   best we can do is just inform her about all possible

1    potential outcomes.

2    Q.  Now, Carswell's a medical facility --

3    A.  Yes.

4    Q.  -- in the federal -- in the Bureau of Prisons?

5    A.  Yes.

6    Q.  So you have psychiatrists and psychologists like

7    yourself on staff, right?

8    A.  Yes.

9    Q.  And social workers?

10   A.  Yes.

11   Q.  What -- where Ms. Hassan is incarcerated, for instance

12   pending trial, if she's not in a medical facility like your

13   own, will that have -- in your opinion will that have some

14   effect on whether these episodic episodes will occur again

15   or not?

16   A.  I think there's no way to predict that.

17   Q.  I mean, the concern I have, and I'll just be straight --

18   and I'll form it in the form of a question, the concern is

19   if she goes back to regular jail without medical staff and

20   without the services that you can provide, is that going to

21   lead her or at least be a risk that she will go back into

22   these delusional thoughts or hallucinations?

23   A.  Without knowing anything about the conditions that she

24   would be going into at any particular facility, I don't

25   think I can make an accurate judgment.

1        I mean, some county jails and some detention

2   centers have psychiatry staff on hand.  Some don't but they

3   routinely send defendants out to an outside hospital.  And

4   without knowing the amount of staffing or resources that

5   they have at any individual facility, I just -- I just can't

6   comment on that.

7   Q.  But is it fair to say that in your opinion, though, she

8   should be in a facility that either outsources psychiatric

9   care or has people on staff that can help her like you can?

10  A.  I can only speak to Ms. Hassan's current state and her

11  current state is of symptom remission.

12       I can't predict how long the symptom remission

13  will last, if it will ever come back or not.  And I

14  certainly can't predict what future hypothetical

15  circumstances might or might not do to her.

16  Q.  Now your facility though, too, you have activities that

17  she can be involved in, is that correct?

18  A.  Yes.

19  Q.  And she can go outside and do things, too, as well, is

20  that correct?

21  A.  Yes.

22  Q.  Not outside the facility --

23  A.  Yes.

24  Q.  -- but outside the actual physical building, out in the

25  fresh air?

     1     A.  Yes.

     2     Q.  Now, if she's in a situation where she's incarcerated in

     3     a facility that doesn't allow her to do that and doesn't

     4     have those activities, is that a risk factor for a person in

     5     Ms. Hassan's condition?

     6     A.  It is and it isn't.  Because when she was on our M3

     7     housing unit, she had much more limited access to any types

     8     of activities that she can access on M1 and yet that's when

     9     we did start to see her symptoms go into remission.

    10     Q.  What kind of activities do you have at M3 that she can

    11     do versus M1?

    12     A.  She can go outside for one hour a day if she chooses.

    13     There are weekly recreation opportunities with the rec

    14     therapist or with a psychologist.

    15          Largely, Ms. Hassan when she was in M3 was not

    16     taking advantage of any of those opportunities because she

    17     was spending so much of her day praying.

    18     Q.  But you would certainly recommend that she have

    19     activities that she do?  I mean, that's definitely something

    20     that you would want to see, I assume, with somebody in her

    21     condition?

    22          Well, let me rephrase that.  I mean, one of the

    23     things that is true with people that have these either mood

    24     disorders or schizophrenia, is they have -- isn't one of the

    25     things I think you described this, is that they have sort of

1    a lack of interest in doing things?

2    A.  That is a symptom of -- yeah, that is a symptom of

3    depression.

4    Q.  Right.  And so it's better if you can -- if you can get

5    the person to do things and it's better for them

6    psychologically I assume, is that correct?

7    A.  Better is a relative term.  And I'm going to be very

8    careful in how I answer this because, of course, it sounds

9    like it's a good idea, and it is a good idea, for people to

10   have opportunities to do those things.

11        But that's very different than being presented

12   with the opportunity.  Being presented with the opportunity

13   to engage in treatment activities and accepting the

14   treatment activities are two very different things.

15        So when Ms. Hassan was on M3 she had activities

16   she could be involved in, however, she wasn't choosing to be

17   involved in them.

18        And regardless of her involvement, her symptoms

19   eventually subsided when the mood episode ran its course.

20   Q.  Okay.  Now your final diagnosis was -- at this point

21   your diagnosis for her was good on competency, is that

22   correct?

23   A.  Yes.

24   Q.  But you also identified the fact that in the future her

25   prognosis was guarded, is that correct?

1     A.  Yes.

2     Q.  And what did you mean by guarded?

3     A.  Guarded meaning it's good at the present time.  She

4     meets all of the necessary prongs for competency to stand

5     trial.

6          However, because of the nature of her episodic

7     symptoms, if they were to exacerbate again in the future,

8     she might be in a situation once again where she's not

9     competent.

10    Q.  And then at that point, if that happened -- and, again,

11    this is a little bit looking down the road, but if it

12    happened, then she would need to be evaluated again for

13    competency at that point in your opinion?

14    A.  Yes.

15          MR. SICOLI:  Thank you.  I have no further

16    questions.

17          THE COURT:  All right.  Thank you, Mr. Sicoli.

18          Any further questions from the Government?

19          MR. KOVATS:  No, Your Honor.  Thank you.

20          THE COURT:  All right.  Thank you.

21          I would normally say you can step down but you're

22    -- anyway, you're released from testimony, Doctor.  Thank

23    you.

24          THE WITNESS:  Thank you.

25          THE COURT:  Mr. Kovats, is there anything further

1    from the Government in terms of evidence?

2              MR. KOVATS:  No, Your Honor.  Not as far as

3    evidence.  Thank you.

4              THE COURT:  All right.  And how -- Mr. Sicoli, if

5    you want to come up, too, how would the parties propose to

6    proceed at this point?  Would you like an opportunity for

7    briefing or did you want to make an argument today?

8              MR. SICOLI:  Your Honor, I'm not sure if we're

9    going to -- if we are going to proceed with briefing.

10             So what I'd like to do, I think I need to get a

11   copy of the transcript.

12             THE COURT:  Okay.

13             MR. SICOLI:  So I can review that.  And I also

14   need to talk with Ms. Hassan about that.

15             THE COURT:  Okay.

16             MR. SICOLI:  With the holidays, I mean, don't know

17   how long it will take with the transcript, but if it's

18   possible, I'd like maybe four weeks to get the transcript,

19   review it.

20             There's also problems sometimes having contact

21   with my client, too.  So I think four weeks would be a safe

22   time.

23             And if we decide not to submit anything to

24   writing, I would just submit a letter to the Court stating

25   that.

1              THE COURT:  So you're asking for four weeks to

2      either submit a brief or a letter stating that you don't

3      intend to submit a brief?

4              MR. SICOLI:  That's correct.  That's correct, Your

5      Honor.

6              THE COURT:  Okay.  Sure.  And I understand your

7      rationale.

8              Mr. Kovats, do you have any concern with that

9      timeframe?

10             MR. KOVATS:  Not under the circumstances, Your

11     Honor.

12             THE COURT:  Okay.

13             MR. KOVATS:  And so I think what we would ask

14     for is -- obviously if there's a letter, I don't expect the

15     Government will need to respond, but if there's a

16     substantive brief coming from the Defendant, we would like

17     two weeks to respond if that would work.

18             THE COURT:  Okay.  Sure.

19             So what I will do is -- thank you.  I will set a

20     deadline of January 14th for the Defendant to either file a

21     brief stating the Defendant's position with regard to

22     competency or a letter stating, I guess, that you don't

23     intend to file a brief.

24             And then I'll give the Government until

25     January 28th to respond to that, Mr. Kovats.

1            And then --

2            MR. KOVATS:  Thank you, Judge.

3            THE COURT:  You're welcome.

4            And then having received those submissions, I will

5    -- I will go ahead and issue a ruling based on the

6    submissions and based, of course of the testimony.

7            I take it neither Counsel want to make an argument

8    today then?

9            MR. SICOLI:  We do not.

10           THE COURT:  Okay.  Mr. Kovats?

11           MR. KOVATS:  We'll forebear, Your Honor.  Thank

12   you.

13           THE COURT:  All right.  Okay.  Thank you.

14           So then I will issue my determination after I have

15   a chance to review the briefing and so on.

16           And if there are proposed orders submitted as well

17   that is always helpful to me.

18           So I know typically the Government submits it but,

19   of course, I'm happy to hear the Defendant's proposed order,

20   too, if you wanted to submit one, as well, all right?

21           All right.  Is there anything further from the

22   Government is?

23           MR. KOVATS:  No, Your Honor.

24           THE COURT:  Anything further from the Defendant?

25           MR. SICOLI:  No, Your Honor.

LYNNE M. KRENZ, RMR, CRR, CRC
(651)848-1226

1            THE COURT:  All right.  Well, thank you all for

2    your time.  Thank you for the testimony.  And we are now in

3    recess.  Thanks.

4            (Court adjourned at 11:25 a.m.)

5                    **REPORTER'S CERTIFICATE**

6

7            I, Lynne M. Krenz, do certify the foregoing
     pages of typewritten material constitute a full, true and
     correct transcript of my original stenograph notes, as they

8    purport to contain, of the proceedings reported by me at the
     time and place hereinbefore mentioned.

9

10           /s/Lynne M. Krenz
             Lynne M. Krenz, RMR, CRR, CRC

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25